UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Marcey Dauterive, | § | |
|         Plaintiff, | § | |
| | § | CASE NO. 4:21-cv-01505 |
| | § | |
| v. | § | |
| | § | |
| Equifax Information Services, LLC; and | § | |
| DOES 1 through 100 inclusive, | § | |
| | § | |
| | § | |
|         Defendants. | § | |

COMES NOW Plaintiff **MARCEY DAUTERIVE** ("Plaintiff"), an individual, based on information and belief, to allege as follows:

## INTRODUCTION

1. This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681s-2(b), 1681e(b), 1681i(a)(2)(A), 1681i(a)(4), and 1681i(a)(5)(A). Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's debt.

2. Defendant Equifax Information Services, LLC ("Equifax") is inaccurately and incompletely reporting three (3) accounts without an account name or original creditor, and is reporting each account twice.

3. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence that is essential to the continued functioning of the banking system.

4. Creditors intentionally and routinely ignore both industry standards and FCRA requirements for accurately reporting debt information. Creditors know that deviating from recognized credit reporting standards and FCRA requirements will make it difficult for consumers to raise their credit scores and improve their creditworthiness.

5. This was not the intent of Congress when it enacted the Fair Credit Reporting Act.

## JURISDICTION & VENUE

6. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

7. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. § 1681.

8. This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

9. Plaintiff alleges that, for purposes of establishing residency under 28 U.S.C. § 1391(b)(1), each of the named Defendants conducts sufficient business within the forum state and this Court has personal jurisdiction over each Defendant under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## GENERAL ALLEGATIONS

10. Plaintiff alleges that Account 54XXXX ("Unnamed Account #1") is reporting on her Equifax credit report without an Account Name or Original Creditor listed and with a current balance. In addition, this account is listed on Plaintiff's credit report twice; once as an open account and once as a collections account.

11. Plaintiff alleges that Account 39XXXX ("Unnamed Account #2") is reporting on her Equifax credit report without an Account Name or Original Creditor listed and with a current balance. In addition, this account is listed on Plaintiff's credit report twice; once as an open account and once as a collections account.

12. Plaintiff alleges that Account 54XXXX ("Unnamed Account #3") is reporting on her Equifax credit report without an Account Name or Original Creditor listed and with a current balance. In addition, this account is listed on Plaintiff's credit report twice; once as an open account and once as a collections account

13. Unnamed Account #1, Unnamed Account #2, and Unnamed Account #3 collectively referred to as the "Unnamed Accounts".

14. Plaintiff alleges that a single account cannot be listed on a credit report more than once.

15. Plaintiff alleges if an account is listed, it must also show the Account Name and/or Original Creditor in order to comply with maximum accuracy and completeness requirements of the FCRA.

16. Plaintiff alleges she filed bankruptcy and received a discharge on December 9, 2019, but due to Equifax's inaccurate and incomplete reporting, she cannot determine if the Unnamed Accounts are correctly reported as unpaid or if each was discharged pursuant to her bankruptcy.

17. Plaintiff alleges that each and every Defendant is familiar with FCRA requirements and subscribes thereto.

18. Plaintiff alleges that each and every Defendant understands that deviation from the FCRA requirements or credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized standards.

19. Plaintiff alleges that all of Defendants' actions alleged herein were committed knowingly, intentionally, and in reckless disregard of the unambiguous meaning of the FCRA, regulatory guidelines on accurate reporting, and credit reporting industry standards to purposefully undermine Plaintiff's ability to repair her FICO Score.

20. In the alternative, Plaintiff alleges that each and every Defendants' actions were the result of negligent policies, procedures, and an objectively unreasonable interpretation of the FCRA, all which inevitably led to inaccurate, misleading, or incomplete credit reporting.

## FACTUAL BACKGROUND

21. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    FICO, Inc.**

22. FICO is a leading analytics software company with its principal headquarters in San Jose, California. FICO has over 130 patents related to their analytics and decision management technology and regularly uses mathematical algorithms to predict consumer behavior, including credit risk.

23. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent (90%) of lending decisions.

24. A FICO Score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

25. Base FICO Scores range from 300 to 850, while industry specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

26. Different lenders use different versions of FICO Scores when evaluating a consumer's creditworthiness.

27. There are twenty-eight (28) FICO Scores that are commonly used by lenders.

28. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

29. The three largest CRAs are Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); and TransUnion, LLC ("TransUnion").

30. FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models, or algorithms, are based on the premise that the information provided by the CRAs is accurate and complies with both the FCRA requirements and credit reporting industry standards.

31. There are five (5) key factors that a FICO Score considers: (1) payment history; (2) amount of debt; (3) length of credit history; (4) new credit; and (5) credit mix.

32. Each of the five (5) factors is weighted differently by FICO.

33. In other words, thirty-five percent (35%) of a consumer's FICO Score relates to payment history, thirty percent (30%) relates to the amount of debt, fifteen percent (15%) relates to the length of credit history, ten percent (10%) relates to new credit, and the final ten percent (10%) relates to a consumer's credit mix, which is the different types of debts reported.

34. Payment history refers to whether a consumer has paid their bills in the past, on time, late, or missed payments. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. Public record items, such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

35. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

36. Once a delinquent account has been remedied, the longer the account stays current the more a consumer's FICO Score should increase.

37. FICO Scores are entirely dependent upon information provided by data furnishers ("DFs"), such as banks and other financial institutions, to CRAs.

38. A FICO Score is a summary of your credit report. In simple terms, the FICO Score is calculated by taking the five (5) factors (payment history, amount of debt, length of credit history, new credit, and credit mix) for each account in a credit report and calculating a three digit number for lenders to review. "When you apply for credit, lenders need a fast and consistent way to decide whether or not to loan you money." *See https://www.myfico.com/credit-education/what-is-a-fico-score*. If a lender or employer did look past the FICO Score into a consumer's reports, chances are they either do not understand the tradeline meanings themselves, or, if they do and realize something appears incorrect, they are incapable of recalculating the complex mathematical algorithms in a FICO Score to take the found error into consideration. Therefore, most lenders and employers do not review individual accounts, just a consumer's FICO Score (or average of FICO Scores) in order to make "quicker decisions". *See Id*.

**B.     Metro 2**

39. The Consumer Data Industry Association ("CDIA") is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening, and collection services industries.

40. The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by CDIA to universally report debts in a particular manner that is understood to be the most accurate in reporting a debt.

41. The CDIA's Metro 2 format is the credit reporting industry standard for credit reporting. While CDIA's Metro 2 format is intended to standardize credit reporting, this standard is still subject to the FCRA's requirement of maximum possible accuracy and completeness.

42. The credit reporting industry at large depends upon the Metro 2 format and the CDIA's recommendations for reporting debt accurately.

43. The CDIA is experienced in credit reporting. In support of this allegation, Plaintiff avers the following:

44. The CDIA offers a FCRA certificate program for all CRAs.
45. The CDIA offers a FCRA awareness program for all CRAs.
46. The CDIA offers a FCRA certificate program for DFs.
47. The CDIA offers a FCRA awareness program for DFs.

48. The CDIA offers a Metro 2 learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 format as well as the relationship between multiple fields.

49. The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and TransUnion.

50. The CDIA developed a credit reporting resource guide for reporting credit.

51. The CDIA's Metro 2 format is accepted by all CRAs.

52. The credit reporting accepted industry standards for reporting Metro 2 accurately are found in the CDIA's credit reporting resource guide ("CRRG").

53. The CRRG outlines the industry standards for reporting debts using Metro 2 format.

54. The CRRG is not readily available to the public. It can be purchased for $229.45.

55. Even if a buyer is ready, willing, and able to pay for the CRRG, the CDIA will not grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.

56. When FICO calculates credit scores, the algorithms use Metro 2 information based on industry standards established by the CDIA.

57. The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.

58. If the Metro 2 data received by FICO deviates from the FCRA requirements or industry standards, an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower, a consumer will be considered a higher credit risk resulting in less favorable lending terms.

**C.    e-OSCAR**

59. e-OSCAR is the web-based, Metro 2 compliant system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

60. When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

61. The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g., "Account Type" "07" (07 in Metro 2 refers to a Charge Account).

**D.     Plaintiff's Credit Report Contains Inaccurate Adverse Tradelines, which Plaintiff Disputed to no Avail**

62.     On November 11, 2020, Plaintiff ordered a three-bureau credit report from Experian to ensure proper reporting by Plaintiff's creditors (the "November 11 Credit Reports").

63.     Plaintiff noticed adverse tradelines in her November 11 Credit Reports, reporting inaccurate, misleading, or incomplete information that did not comply with FCRA standards.

64.     Plaintiff then disputed the inaccurate tradeline regarding the Unnamed Accounts via certified mail to Equifax on or about January 20, 2021 (the "Dispute Letter").

65.     Plaintiff's Dispute Letter specifically put Equifax on notice that there was no data furnisher identity listed for the Unnamed Accounts.

66.     Plaintiff's Dispute Letter also detailed what was perceived to be problematic about the accounts, addressing each tradeline individually.

67.     Plaintiff requested that any derogatory reporting be updated to ensure accuracy and completeness of the accounts as required by the FCRA.

68.     Plaintiff is informed and believes that Equifax received Plaintiff's Dispute Letter and, in response, sent Plaintiff's dispute to the data furnishers of the Unnamed Accounts, as the data furnisher, via an ACDV through e-OSCAR.

69.     On February 26, 2021, Plaintiff ordered a second three-bureau credit report from Experian to determine if her accounts were updated.

   a.     **Inaccuracy – Unnamed Accounts**

70.     Despite actual knowledge, Equifax continued to report Plaintiff's account, beginning in 54XXXX, without an Account Name or Original Creditor name, and as two, separate tradelines (an Open Account and a Collections Account), each listing the full balance. This is patently inaccurate as a single account cannot be reported more than once, and reporting accounts without an Account Name or Original Creditor is wholly incomplete.

71.     Despite actual knowledge, Equifax continued to report Plaintiff's account, beginning in 39XXXX, without an Account Name or Original Creditor name, and as two, separate tradelines (an Open Account and a Collections Account), each listing the full balance. This is patently inaccurate as a single account cannot be reported more than once, and reporting accounts without an Account Name or Original Creditor is wholly incomplete.

72. Despite actual knowledge, Equifax continued to report Plaintiff's account, beginning in 39XXXX, without an Account Name or Original Creditor name, and as two, separate tradelines (an Open Account and a Collections Account), each listing the full balance. This is patently inaccurate as a single account cannot be reported more than once, and reporting accounts without an Account Name or Original Creditor is wholly incomplete.

73. Reporting a single account as two tradelines, each listing the full balance, is patently inaccurate. Further, as the algorithms that calculate credit scores cannot account for or offset duplicated reporting, this type of reporting is also misleading to an extent to adversely affect credit decisions.

74. Equifax did not update the tradelines on any of the Unnamed Accounts to reflect the Account Name or Original Creditor.

75. Equifax did not update the reporting to delete the duplicated tradelines of the Unnamed Accounts or remove the balance from the duplicated accounts.

76. Equifax was provided notice that Plaintiff was disputing the inaccurate and misleading information, but Equifax failed to conduct a reasonable investigation of the information as required by the Fair Credit Reporting Act.

77. The most basic investigation would include a simple review of the account as reported compared to the maximum possible accuracy and completeness standard of the FCRA.

78. Plaintiff alleges that Equifax did not review if its reporting complied with the unambiguous language of the FCRA or regulatory guidelines on accurate reporting under the FCRA.

79. If Equifax reviewed such standards, Equifax would have seen that its reporting was not in compliance and was therefore inaccurate or incomplete.

80. By continuing to report each of the Unnamed Accounts twice, it incorrectly appears to third parties viewing Plaintiff's credit report that Plaintiff currently owes twice the amount she may actually owe, if any, which in inaccurate. Further, as this inaccurate double reporting is being used to calculate Plaintiff's FICO Score, the FICO Score alone being what most lenders and employers use to determine Plaintiff's creditworthiness, it is misleading in such a way as to adversely affect credit decisions.

81. In addition, by continuing to report each of the Unnamed Accounts without an Account Name or Original Creditor, Plaintiff is unable to identify who else, if anyone, may be

responsible for these inaccurate tradelines. Further, without being able to identify the data furnishers, Plaintiff is unable to determine if the accounts are fraudulent, if the payment status and outstanding balance are inaccurate, or if these accounts were included and discharged in her prior bankruptcy.

82. The lack of investigation and reporting of inaccurate and incomplete information by Equifax is unreasonable.

**E.  Damages**

83. Plaintiff pulled the credit reports at issue at a cost for access to the report, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

84. As a result of the incorrect reporting, Plaintiff has also suffered emotional harm, physical sickness, and excessive stress resulting in doubt as to the effectiveness of the Fair Credit Reporting Act and the power of this Court to preserve his right to a complete and accurate credit report.

85. Plaintiff has been denied credit and is unable to rebuild her credit based on the inaccurate reporting by Equifax.

86. Equifax's actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681.

## FIRST CAUSE OF ACTION
## (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))
## (Against Defendants and Does 1-100)

87. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.  Equifax Failed to Assure Credit Reporting Accuracy**

88. Equifax violated 15 U.S.C. § 1681e(b) by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and the credit files it published and maintained concerning Plaintiff.

89. Had Equifax maintained reasonable procedures to assure maximum accuracy, it would have never reported any of the Unnamed Accounts as described herein.

90. Equifax knew, or should have known, the Unnamed Accounts are each required to be reported with an Account Name and Original Creditor for completeness, and that Plaintiff cannot verify any of the accounts without such information. Equifax knew, or should have known,

each of the Unnamed Accounts can only be reported once, and that reporting each account twice, each with a balance, is patently incorrect and misleading. Further, Equifax knew, or should have known, that these inaccurate and incomplete tradelines do not reflect maximum possible accuracy and completeness as required by the FCRA.

91. As a result of Equifax's violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit and other mental and emotional distress.

**B.  Willful Violations**

92. Equifax's violations, as described herein, were willful; specifically, Equifax has intentionally and purposefully set up a system where inaccuracies are not only probable, but inevitable.

93. Equifax regularly, as a policy, ignores disputes by consumers and fails to perform even a basic investigation regarding the disputes. Additionally, Equifax regularly fails to forward disputes to data furnishers, thereby frustrating the entire dispute process.

94. To the extent Equifax does send consumer disputes, it sends these disputes to employees who do not live within the continental United States to hide or subvert a consumer's liability to confront the individual(s) directly responsible for approving accurate reporting.

95. Equifax's employees receive little to no training concerning how to accurately report consumer debt.

96. Instead, Equifax's employees are instructed to parrot whatever information a data furnisher provides regardless of whether the information is accurate.

97. Equifax's employees are regularly expected to review and approve over ninety (90) disputes per day, rendering less than five (5) minutes to review, investigate, and respond to each dispute received.

98. Equifax has intentionally set up this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

99. As a result of Equifax's violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

100. Equifax's violations were willful, rendering it liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.

101. In the alternative, Equifax was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

102. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys' fees from Equifax in an amount to be determined by this Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## SECOND CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(1))

### (Against Defendants and Does 1-100)

103. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A. Equifax Failed to Reinvestigate the Disputed Information in violation of 15 U.S.C. § 1681i(a)(1)**

104. Pursuant to 15 U.S.C. 1681i(a)(1), Equifax was required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's dispute regarding the Unnamed Accounts.

105. Thus, Equifax failed to conduct a reasonable investigation and correct the misleading and/or inaccurate statements on the accounts within the statutory time frame.

106. Equifax is not a passive entity bound to report whatever information a data furnisher provides.

107. Plaintiff alleges Equifax is readily familiar with FCRA requirements and credit reporting industry standards.

108. Based on the foregoing, Plaintiff alleges that Equifax can, and does, suppress inaccurate information from being reported when data furnishers provide inaccurate information.

109. Equifax can and does instruct data furnishers on how to properly report certain accounts from time to time upon request from a data furnisher.

110. Equifax failed to conduct a reasonable investigation because any basic investigation would have uncovered that it was reporting each of the Unnamed Accounts inaccurately and incompletely.

111. Had Equifax conducted a proper investigation it could have added an Account Name and Original Creditor to each of the Unnamed Accounts and deleted the duplicated reporting of each of the Unnamed Accounts. However, Equifax continued to report the Unnamed Accounts as described herein.

112. Equifax, therefore, did not conduct even the most basic investigation regarding credit reporting industry standards, otherwise the aforementioned would have been uncovered.

## THIRD CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))

### (Against Defendants and Does 1-100)

113. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.  Equifax Failed to Review and Consider all Relevant Information**

114. Equifax violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

115. Equifax's violations of 15 U.S.C. § 1681i(a)(4) have caused Plaintiff to suffer actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.  Willful Violations**

116. Equifax's violations were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

117. In the alternative, Equifax was negligent in failing to review and consider all relevant information Plaintiff submitted, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

118. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys' fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**FOURTH CAUSE OF ACTION**

**(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))**

**(Against Defendants and Does 1-100)**

119. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.  Equifax Failed to Delete Disputed and Inaccurate Information**

120. Equifax violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

121. Equifax's violations of 15 U.S.C. § 1681i(a)(5)(A) have resulted in Plaintiff suffering actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.  Willful Violations**

122. Equifax's violations were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

123. In the alternative, Equifax was negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

124. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys' fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**PRAYER FOR RELIEF**

125. WHEREFORE, Plaintiff prays for judgment as follows:

   a. For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;
   b. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;
   c. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;
   d. Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;
   e. For determination by the Court that Defendant's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq.*; and

  f. For determination by the Court that Defendant's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

                Respectfully submitted,

                **SCHUMACHER LANE PLLC**

Dated: May 5, 2021          */s/ Kyle Schumacher*
                Kyle Schumacher
                Attorney for Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial of this matter by jury.

**SCHUMACHER LANE PLLC**

Dated: May 5, 2021

*/s/ Kyle Schumacher*
Kyle Schumacher
Attorney for Plaintiff